**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| CHRISTOPHER ROPKO and THOMAS BURDI, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2024-1193-PAF |
| PHILLIP McNEILL, JR., | ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| McNEILL INVESTMENT GROUP, LLC, | ) ) ) | |
| Nominal Defendant | ) ) ) | |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: September 22, 2025
Date Decided: March 16, 2026

Stephen J. Kraftschik, POLSINELLI PC, Wilmington, Delaware; Mozianio S. Reliford, III, POLSINELLI PC, Nashville, Tennessee; Kevin M. Hogan, POLSINELLI PC, Chicago, Illinois; LaDyrian Cole, Ryan Mathis, POLSINELLI PC, Dallas, Texas; *Attorneys for Plaintiffs Christopher Ropko and Thomas Burdi*

Jamie L. Brown, Elena M. Sassaman, Jenny E. Li, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; James C. Bradshaw, III, WYATT, TARRANT & COMBS LLP, Nashville, Tennessee; *Attorneys for Defendant Phillip McNeill, Jr.*

**FIORAVANTI, Vice Chancellor**

This post-trial memorandum opinion resolves a dispute over the control of a Delaware limited liability company. The company is governed by a managing board. Two of its three members hold their seats by virtue of being officers of the company. The third member is the company's founder and largest equity holder. The founder and the two officers are parties to a voting agreement that requires the officers to vote in their capacities as managing board members "in the same manner" as the founder. The founder became dissatisfied with the officers' performance and purported to remove them through a unanimous written consent of the managing board.

The court concludes that the founder's attempt to remove the officers was ineffective because the voting agreement did not grant the founder a proxy to vote on behalf of the other two members of the managing board. The court also concludes that the founder lacked authority to remove the officers under the terms of the limited liability company agreement. Accordingly, the officers are entitled to declaratory relief under 6 *Del. C.* §§ 18-110 and 18-111 that the removals were invalid. They are also entitled, under a contractual fee-shifting provision, to recover their reasonable attorneys' fees and expenses for pursuing this action.

## I.    BACKGROUND

These are the facts as the court finds them after trial.[1]

### A.    The Parties

McNeill Investment Group, LLC ("MIG" or the "Company") is a Delaware limited liability company founded in June 2022 and headquartered in Germantown, Tennessee.[2]  MIG owns and manages a portfolio of hotels across the United States.[3]  MIG has three categories of units:  Common Units (consisting of Class A Units and Class B Units), Incentive Units, and Voting Units.[4]  MIG has had about 40 members

---

[1] Other factual findings are contained in the analysis of the claims.  Deposition testimony is cited as "(Surname) Dep."; trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the docket number and the relevant section, page, paragraph, or exhibit.  Citations to testimony presented at trial are in the form "Tr. # (X)," with "X" representing the name or surname of the speaker.  Citations to the transcript of post-trial oral argument, Dkt. 140, are in the form of "Post-Trial Arg."  After being identified initially, individuals are referenced herein by their surnames without regard to honorifics.  No disrespect is intended.  Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.  When resolving factual disputes, this decision generally gives more weight to contemporaneous evidence.  *See Lynch v. Gonzalez*, 2020 WL 4381604, at *5 (Del. Ch. July 31, 2020) ("The relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact." (citation modified)), *aff'd*, 253 A.3d 556 (Del. 2021) (TABLE); *see also BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *2 (Del. Ch. Feb. 2, 2022) ("The witness testimony often conflicted with the contemporaneous record.  In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents.").

[2] PTO ¶ 5; JX 51 (hereinafter "Operating Agreement") § 1.3.

[3] JX 70 at 4.  The Company did not enter an appearance through counsel in this action.

[4] Operating Agreement § 3.1(A).

at any given time.[5]    An aggregator entity named MIG Executive Incentive Aggregator I, LLC (the "Aggregator"), comprising principals and key management members, holds the Incentive Units.[6]  MIG is governed by a Managing Board, which comprised three members at the time of the events giving rise to this action.  Those three members are parties in this action.

Defendant Phillip McNeill, Jr. ("McNeill" or the "Defendant") is MIG's executive chairman and a member of its Managing Board.[7]  McNeill holds 100% of MIG's outstanding Voting Units.[8]   In addition, the McNeill family owns approximately 65% of MIG's Common Units.[9]

Plaintiff Christopher Ropko served as MIG's chief executive officer ("CEO") from MIG's inception and became a member of the Managing Board on June 23, 2023.[10]  Through his family trust, Ropko is a member of MIG and the Aggregator.[11]

---

[5] McNeill Dep. 24:10−13; JX 307.

[6] JX 58 at 14; Operating Agreement § 3.4.

[7] PTO ¶ 3.

[8] *Id.*

[9] JX 151.

[10] PTO ¶¶ 18, 21.

[11] *Id.* ¶ 1.

Plaintiff Thomas Burdi (together with Ropko, the "Plaintiffs") became MIG's chief operating officer ("COO") in June 2022 and joined the Managing Board on June 23, 2023.[12] Burdi is a member of MIG and the Aggregator.[13]

## B. Factual Background

### 1. The McNeill-Ropko relationship and MIG's origins

McNeill is a second-generation hotelier with over 30 years of experience in real estate development, management, and construction.[14] McNeill, the son of Phillip McNeill Sr. ("McNeill Sr."), started his career at one of his father's companies.[15] In 2014, McNeill co-founded McNeill Hotel Company ("MHC").[16] MHC comprises a portfolio of properties located across several Southeast and Central U.S. states.[17] Over time, MHC raised approximately $65 million from a network composed primarily of family and friends.[18]

In late 2017, McNeill engaged RobertDouglas Capital LLC ("RobertDouglas"), a hospitality investment bank, to raise institutional capital to

---

[12] *Id.* ¶¶ 17–18, 21.

[13] *Id.* ¶ 2.

[14] JX 32 at 8, 10.

[15] PTO ¶ 4; McNeill Dep. 13:1−5.

[16] PTO ¶ 6; JX 32 at 8; McNeill Dep. 13:14−19.

[17] JX 32 at 8, 16.

[18] Tr. 162:14−16 (McNeill).

grow MHC.[19]   Ropko, one of RobertDouglas's founding members, helped to facilitate one of those investments.[20]   Following that transaction, in March 2018, McNeill offered Ropko the position of MHC's chief financial officer.[21]   Ropko accepted and moved from Northern California to Memphis, Tennessee.[22]   In the second quarter of 2022, McNeill became MHC's Chairman and elevated Ropko to CEO.[23]

### 2.   MIG's original governance structure

On June 10, 2022, McNeill formed MIG as a master vehicle for investments in the hospitality industry.[24]   McNeill Hospitality Holdings, LLC ("MHH") became MIG's sole member, and MHC became a wholly owned subsidiary of MIG.[25]   MIG was initially governed by the Limited Liability Company Agreement, dated June 10, 2022 (the "Original Operating Agreement").[26]   The Original Operating Agreement

---

[19] PTO ¶ 7.

[20] *Id.*; Tr. 162:9−22 (McNeill); Ropko Dep. 15:8−20, 17:21−24.

[21] PTO ¶ 8; Tr. 170:24−171:9 (McNeill).

[22] Tr. 58:13−15 (Ropko); Ropko Dep. 15:21−25.

[23] PTO ¶ 9; Ropko Dep. 16:1−3; McNeill Dep. 40:15−21 (referring to Ropko's appointment as MHC's CEO in the second quarter of 2022).

[24] McNeill Dep. 13:1−9, 21:24−22:3, 29:15−22, 30:2−11.

[25] JX 3 at 18, 24 ¶¶ 2, 7.

[26] *Id.* at 7−17.

was intended as an interim arrangement pending a broader governance restructuring.[27]

Under the Original Operating Agreement, MIG was managed by a one-member board of directors (the "Board of Directors").[28] As of MIG's formation, McNeill served as the sole director and chairman.[29] The size of the Board of Directors could be increased only by MIG's members, who also held the exclusive right to elect and remove directors.[30] At that time, McNeill announced that he was stepping back from day-to-day operations but that senior executives would continue to report to him directly.[31]

Consistent with the plan of assembling an investment team dedicated to attracting institutional investors,[32] the Original Operating Agreement designated Ropko as CEO and Lindsey Chang as executive vice president of investments.[33]

---

[27] PTO ¶ 11; JX 3 at 5−6.

[28] Original Operating Agreement § 16.1.

[29] PTO ¶ 10; Original Operating Agreement §§ 16.1−16.2, 16.8.

[30] Original Operating Agreement §§ 16.2−16.3.

[31] JX 17 at 3; Tr. 173:14−23 (McNeill).

[32] JX 75 at 6; Tr. 174:7−11 (McNeill).

[33] Original Operating Agreement § 16.8.

Ropko later recruited Burdi to serve as COO.[34] The management team's composition was publicly announced in August 2022.[35]

In 2023, the team embarked on a "multi-strategy hospitality investment management platform" that contemplated "a broader spectrum of investments."[36] The team targeted a minimum capital raise of $250 million, with an initial target of $100 million.[37] The Company's governance plan included a merger of MHH and MIG, with the conversion of MHH's units into Common Units of MIG.[38] The team also anticipated expanding the governing body to provide representation to large institutional investors.[39] But the plan always intended for McNeill to maintain control.[40]

### 3.    The 2023 governance overhaul and the Voting Agreement

To implement the governance changes, McNeill directed counsel at Wyatt Tarrant & Combs, LLP, and Sussan Harshbarger, MIG's then-chief legal officer, to

---

[34] Tr. 173:24−174:6 (McNeill); JX 17 at 3; *see also* Original Operating Agreement § 16.8 (indicating Ropko's role as CEO); JX 2 (memorializing Ropko's recruitment of Burdi in May 2022); Tr. 9:18−10:3 (Ropko).

[35] JX 6; JX 7.

[36] JX 32 at 14.

[37] *Id.* at 15.

[38] JX 34 at 4−5 §§ 1.1, 1.3, 3.1; JX 32 at 15; Tr. 17:15−18:12 (Ropko).

[39] Tr. 176:4−10 (McNeill).

[40] *Id.* at 176:24−177:1.

prepare an amended limited liability company agreement for MIG and a related side agreement.[41]  Contemporaneous communications and testimony confirm that the side agreement was intended to ensure that McNeill retained control of a majority of the votes on the governing body.[42]

In May 2023, Harshbarger and MIG's executives outlined a plan to present the contemplated strategy and new governance structure to certain investors.[43]  On June 13, 2023, MHH disseminated proposed member consents to authorize a merger with MIG and to amend the Original Operating Agreement.[44]  On June 20, 2023, Harshbarger hosted an investor meeting at which investors representing nearly one-third of the voting power were present.[45]  According to notes of the call, Harshbarger told investors that the new structure did not involve "substantial changes" and that

---

[41] PTO ¶ 15; JX 5 at 1; JX 11 at 9−10, 13; JX 18 at 1 (Harshbarger informing Ropko that she "need[ed] to prepare the side letter regarding consistent voting"); Tr. 27:20−22 (Ropko) ("[McNeill] sought an agreement from myself and [] Burdi that we would collaborate; we wouldn't commandeer and take over the board."); *id.* at 461:1−2 (Harshbarger); *see also* JX 27; JX 28; JX 29 (reflecting initial drafts of a voting agreement between McNeill, Ropko, and Burdi).

[42] Tr. 176:16−177:1 (McNeill); *see id.* at 461:1−2 (Harshbarger) ("[I]t was never intended that McNeill would not have full control.").  McNeill's intent to retain control is reflected in the draft history of the side letter, which shows that he rejected earlier versions that did not fully capture that objective.  *See* JX 27; JX 29.

[43] *See* JX 18 at 2.

[44] JX 34.  The attachments to the email are:  (i) the written consent to authorize the merger; (ii) the plan of merger agreement; and (iii) the amended and restated operating agreement of MIG.  *Id.*

[45] JX 37.

8

"[McNeill] [wa]s still in control."[46]  After the call, a majority of MHH's members approved the merger and the amendment to the Original Operating Agreement by written consent.[47]

On June 21, 2023, McNeill, Ropko, and Burdi executed a short letter agreement (the "Voting Agreement").[48]  The substance of the Voting Agreement states in its entirety:

> Dear [McNeill]:
>
> This letter will confirm our agreement that in consideration for a seat on the Board of Directors (rather than you being sole member of the Board of Directors), so long as you are a member of the Board of Directors of [MIG], actions of the Board of Directors of [MIG] will require your consent and the [CEO] (currently [] Ropko) and the [COO] (currently [] Burdi) will vote in the same manner as you.[49]

Although investors were informed one day earlier that McNeill would remain in control, the documents circulated with the form of member written consent did not include or mention the Voting Agreement.[50]

---

[46] *Id.* at 3.

[47] JX 35; JX 41 at 1−2.

[48] PTO ¶ 16; JX 39 at 2 (hereinafter "Voting Agreement"); JX 42; JX 43; JX 44; JX 41 at 1.

[49] *See* Voting Agreement.

[50] McNeill Dep. 27:1−4.

On June 29, 2023, MIG adopted the Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"), effective June 23, 2023.[51] The Operating Agreement vests MIG's management in the Managing Board.[52] The initial members of the Managing Board were: McNeill, MIG's "then-CEO" (Ropko), and MIG's "then-COO" (Burdi).[53]

### 4. Post-amendment strategy, capital raise, and GrowthCo

MIG's initial objective was to raise $100 million in capital.[54] Despite the ambitious goal, MIG ultimately raised only $900,000.[55] These investments came primarily from existing members with longstanding ties to McNeill and only two new investors.[56] Worse yet, MIG incurred more than $2 million in expenses related

---

[51] PTO ¶ 12; Operating Agreement at 3, 8. The Operating Agreement is MIG's operative limited liability agreement.

[52] Operating Agreement § 7.1(A); PTO ¶ 18.

[53] Operating Agreement § 7.2; JX 39 at 6−7. The Operating Agreement calls for a five-member Managing Board. The parties contemplated that future investors might be allowed to designate representatives for the other two seats. PTO ¶ 19. The new governance arrangement would provide for the issuance of management incentive units to incentivize executives and compensate them for value creation. JX 9 at 8; Operating Agreement § 3.4; Tr. 58:16−59:5 (Ropko).

[54] JX 32 at 40; Tr. 54:10−15 (Ropko); *id.* at 175:3−6, 175:8−10 (McNeill); McNeill Dep. 72:11−13; Chang Dep. 73:14−16.

[55] PTO ¶ 20; Tr. 192:7−10 (McNeill).

[56] JX 307; Chang Dep. 73:24−74:14. The two new investors were a realtor that Ropko had hired to market MIG's securities and one of the realtor's friends. *See* JX 307; JX 150; Ropko Dep. 240:25−245:9 (describing that the realtor's role was to promote investments in MIG on social media). Since then, McNeill has repurchased the realtor's shares at her request. JX 305; JX 306.

to the capital-raising effort, including salaries, travel, and legal fees.[57] McNeill and the other investors were not pleased.[58] Members began to question Ropko about management's performance and pressed for McNeill's direct involvement.[59] Some signaled a desire to divest.[60]

The disappointing results of the capital raise hampered efforts to launch the new strategy.[61] Between late 2023 and early 2024, management pivoted and began to explore separating legacy operations from growth initiatives by creating a new entity, "GrowthCo."[62] Conceptually, the executive team would move to GrowthCo, which would contract with MIG to manage MHC's hotels.[63] This arrangement was designed to externalize certain overhead costs while maintaining operational continuity.[64] The plan contemplated GrowthCo's dependence on MIG, both because MIG was funding GrowthCo's planning and because it would have been responsible

---

[57] Tr. 191:23−192:6 (McNeill); JX 11; JX 56; JX 57.

[58] Tr. 175:16−176:3, 192:20−193:4 (McNeill); Chang Dep. 82:15−19.

[59] Chang Dep. 78:20−79:20.

[60] JX 69 at 1 ("The tone of the meeting at first was that everyone wanted out"); Tr. 194:5−19 (McNeill).

[61] Tr. 175:16−176:3 (McNeill).

[62] *Id.* at 196:15−23; Ropko Dep. 233:13−16, 234:9−14, 263:24−265:5; Burdi Dep. 74:9−15, 84:18−23.

[63] Chang Dep. 42:17−19.

[64] Ropko Dep. 234:9−14; JX 81; JX 95 at 11; Chang Dep. 43:14−18, 106:24−108:7.

for paying management fees.[65]  Ropko initially proposed an annual management fee of $1.5 million.[66]  McNeill considered that amount excessive and pushed back, proposing a $500,000 cap.[67]  In the ensuing months, the Managing Board members discussed multiple iterations of GrowthCo's structure and relationship to MIG, but the parties ultimately did not finalize the specifics.[68]

### 5.    The "MxR Hospitality" joint venture and McNeill's concerns

In February 2024, MIG began negotiating a joint venture with RREAF Holdings LLC ("RREAF"), a Dallas-based real estate private equity firm.[69]  The joint venture, to be operated as "MxR Hospitality," would develop extended-stay hotels.  One obstacle to the MxR Hospitality joint venture was a noncompetition clause in a separate joint venture between MIG and another entity, Prospect Ridge.[70]  One of the strategies to avoid the noncompete contemplated McNeill Sr.'s

---

[65] JX 74; JX 79.

[66] JX 81 at 4; *see also id.* at 5 (indicating "LegacyCo AM Fees" for $1,500,000 for Year 1); Chang Dep. 62:3−11.

[67] JX 87 at 1−2.

[68] Tr. 324:11−14 (McNeill); *id.* at 451:14−452:3 (Burdi) (testifying that management discussed over 20 iterations of GrowthCo).

[69] *Id.* at 197:19−21, 199:4−5, 315:18−21 (McNeill).  McNeill testified that the opportunity had been first identified in the spring or summer of 2023 by Brent McDowell, who oversaw business development.  *Id.* at 197:19−198:7, 198:16−199:3.

[70] *Id.* at 162:23−163:5, 199:10−18; *id.* at 142:1−7 (Ropko); *id.* at 469:14−22 (Chang); Chang Dep. 34:9−17, 72:2−5; McNeill Dep. 56:5−9; Harshbarger Dep. 46:10−14.

involvement in MxR Hospitality, as he had no restrictions under the terms of the venture with Prospect Ridge.[71]

After he returned to day-to-day operations, McNeill became concerned about MIG's financial position, including MIG's ability to meet its obligations and readiness for the anticipated seasonal slowdown.[72] McNeill also believed that management was intentionally delaying efforts to finalize the joint venture with RREAF to prioritize GrowthCo.[73] In August 2024, McNeill became directly involved in the RREAF negotiations. In mid-September 2024, RREAF executed joint venture documents with an entity owned by McNeill Sr.[74] The venture was formed through McNeill Economy Hospitality LLC.[75] Under that structure, McNeill Sr. held all Class A voting interests, while MIG's members received Class B interests that carried only profit participation rights.[76]

---

[71] Tr. 199:19−22, 318:7−13, 325:1−8 (McNeill).

[72] *Id.* at 204:2−205:16.

[73] *Id.* at 199:24−200:9; *see also id.* at 203:24−204:1 ("I felt like . . . there was a lot of self-dealing.").

[74] *Id.* at 202:4−13; JX 129 at 1.

[75] JX 129 at 1.

[76] Tr. 202:4−13 (McNeill).

### 6. The October 7, 2024, terminations and the Removal Consent

By late September 2024, McNeill had concluded that the new investment strategy had been a failure.[77]  He also decided that to protect MIG's long-term investors and the family business, Ropko and Burdi needed to go.[78]  In a phone call on October 7, 2024, McNeill informed Ropko that he was terminating the investment team and removing Ropko and Burdi from their officer positions and from the Managing Board.[79]  McNeill did not convene a Managing Board meeting.[80]  Instead, he purported to remove Ropko and Burdi unilaterally through a written consent of the Managing Board (the "Removal Consent").  The Removal Consent was executed on November 26, 2024, but is dated October 7, 2024.[81]  The Removal Consent's signature block for the "Managing Board" identifies the signatory as:  "Phillip H.

---

[77] *Id.* at 206:17−19 (referring to a "failed experiment" and a "failed strategy.").

[78] *Id.* at 205:14−206:2 ("And it was a moment where I thought, you know what, this is spinning out of control.  My family's business is going to be bankrupt.  So I said I need to make a decision.  And I decided that the investment group was not a viable investment strategy for us.  It was costing us a ton of money.  The investors were upset.  And I made a decision in the best interest of our investors and our family that it needed to change, needed to go back to what we do best, and that was to develop select service hotels, own and manage.  And I made that decision, and it was just me.").

[79] PTO ¶ 21; Tr. 206:15−20 (McNeill).

[80] Tr. 206:21–22 (McNeill).

[81] PTO ¶ 22; JX 120; JX 121.

McNeill, Jr., individually and on behalf of Christopher M. Ropko and Thomas M. Burdi pursuant to that certain [Voting] Agreement."[82]

The Voting Agreement had never been invoked before McNeill's Removal Consent.  Prior to that time, the members of the Managing Board had always been aligned, acting informally at meetings or by unanimous written consent.[83]

## C.    Procedural History

On November 21, 2024, Ropko filed a verified complaint together with a motion for a status quo order.[84]  On January 14, 2025, the court entered a status quo order (the "Status Quo Order") providing that, during the pendency of this action, McNeill would remain the sole Managing Board member and not take any action outside the routine day-to-day operations of MIG conducted in the ordinary course of business.[85]

On February 24, 2025, Burdi joined as a plaintiff in an amended complaint (the "Amended Complaint").[86]  The Amended Complaint asserts three counts

---

[82] JX 120 at 2.

[83] Tr. 188:22−189:1, 345:8−13 (McNeill); *id.* at 134:22−135:4 (Ropko); *id.* at 404:6−16 (Burdi).

[84] Dkt. 1.

[85] Dkt. 28 ¶¶ 3−4.  Plaintiffs have filed two motions asking the court to hold Defendant in contempt for violating the Status Quo Order.  Those motions will be addressed in a separate order.

[86] Dkt. 48.

seeking declaratory relief under 6 *Del. C.* §§ 18-110 and 18-111 regarding the validity of McNeill's Removal Consent purporting to remove Plaintiffs as Managing Board members and officers and McNeill's authority to appoint himself as the Company's sole officer.[87]

The court held a two-day trial on May 20 and 21, 2025, followed by post-trial briefing and argument.[88]

## II.   ANALYSIS

### A.   Legal Standard

The Limited Liability Company Act (the "LLC Act") empowers this court to "hear and determine . . . the right of any person to become or continue to be a manager of a limited liability company." 6 *Del. C.* § 18-110(a); *see Zohar III Ltd. v. Stila Styles, LLC*, 2022 WL 1744003, at *8 (Del. Ch. May 31, 2022), *aff'd sub nom. Tilton v. Zohar III Ltd., Inc.*, 285 A.3d 1204 (Del. 2022). The scope of a Section 18-110(a) proceeding "is limited to determining those issues that pertain to the validity of actions to elect or remove a [manager] or officer." *Genger v. TR Invs.*, 26 A.3d 180, 199 (Del. 2011); *accord Llamas v. Titus*, 2019 WL 2505374, at *15 (Del. Ch. June 18, 2019) (observing that Section 18-110 is the limited liability

---

[87] *Id.* ¶¶ 43−55.

[88] Dkts. 94−95, 100, 102, 106, 113, 135, 140.

16

company analogue to 8 *Del. C.* § 225 and applying Section 225 principles in that context).

The "[p]laintiff . . . has the burden of proving its claim under Section 18-110 of Delaware's Limited Liability Company Act by a preponderance of the evidence." *Bold St. Peters, L.P. v. Bold on Blvd. LLC*, 2024 WL 4825169, at *1 (Del. Ch. Nov. 19, 2024) (citing *Lynch*, 2020 WL 4381604, at *30). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citation modified).

"In determining what claims are cognizable in a [Section 18-110] action, the most important question that must be answered is whether the claims, if meritorious, would help the court decide the proper composition of the [company's] board or management team." *Zohar III*, 2022 WL 1744003, at *8 (alteration in original) (quoting *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999), *aff'd as modified*, 727 A.2d 530 (Del. 1999) (TABLE)). If the resolution of the parties' dispute over the company's management requires interpretation and enforcement of a limited liability company agreement, the court may "interpret, apply, or enforce provisions of the [limited liability company's] operating agreement on the

17

[company's] behalf." *2009 Caiola Fam. Tr. v. PWA, LLC*, 2015 WL 6007596, at *11 n.71 (Del. Ch. Oct. 14, 2015).

To resolve this dispute, the court must construe the Voting Agreement and the Operating Agreement, applying "the same principles that are used when construing and interpreting other contracts." *Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 923–24 (Del. 2023) (citation modified); *see also, e.g.*, *Salamone v. Gorman*, 106 A.3d 354, 367−68 (Del. 2014). "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)). If the contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms as reflected in the four corners of the agreement. *Id.* at 1159–60; *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012). In doing so, the court must "evaluate 'the contract as a whole' and [] give effect to all its provisions." *Johnson & Johnson v. Fortis Advisors LLC*, --- A.3d ----, 2026 WL 89452, at *25 (Del. Jan. 12, 2026) (quoting *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010)).

"Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party

18

would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

### 1. The Voting Agreement did not give McNeill unilateral authority to execute a written consent of the Managing Board.

Defendant argues that the Voting Agreement is a valid and enforceable contract that authorized him to vote on Plaintiffs' behalf in their capacities as members of the Managing Board.[89] Plaintiffs challenge the validity and enforceability of the Voting Agreement. First, they contend that there was no "meeting of the minds" among McNeill, Ropko, and Burdi as to the effect of the voting arrangement.[90] Second, they argue that the Voting Agreement is unenforceable and inconsistent with the Operating Agreement.[91] Third, they contend that the Voting Agreement does not require them to vote as directed by McNeill.[92]

---

[89] Def.'s Answering Br. 37, 43–50.

[90] Pls.' Opening Br. 49.

[91] *Id.* at 37–40; Pls.' Reply Br. 11–12.

[92] Pls.' Opening Br. 35–36; Post-Trial Arg. at 13:4−7.

The court need not decide whether the Voting Agreement is valid or enforceable in all respects. For purposes of resolving this narrow dispute, the court assumes that the Voting Agreement is valid and enforceable against Plaintiffs. As discussed below, McNeill's attempt to remove Plaintiffs through the Removal Consent did not comply with either the Voting Agreement or the Operating Agreement.

**2. The removal of Plaintiffs as officers requires formal Managing Board action.**

The central merits question is whether McNeill's October 7, 2024, phone call to Ropko or the November 26, 2024, Removal Consent validly removed Plaintiffs as officers and as members of the Managing Board under the Operating Agreement. McNeill maintains that the removals were valid under either the Voting Agreement or the Operating Agreement. First, relying on the Voting Agreement, McNeill argues that the Removal Consent was effective to remove Plaintiffs as officers, thereby terminating their board positions.[93] Second, McNeill contends that, irrespective of the Voting Agreement, he personally had the authority to remove Plaintiffs under the terms of the Operating Agreement because he appointed them as officers.[94]

---

[93] Def.'s Answering Br. 42.

[94] *Id.* at 38.

20

### a. The Operating Agreement vests officer removal authority in the Managing Board.

Plaintiffs were members of the Managing Board by virtue of their being officers.[95] Officers of MIG may be removed by the Managing Board, with or without cause.[96] Removal of officers, along with termination of their employment contracts, requires "prior approval of the Managing Board."[97] The Managing Board exercises its authority under Section 7.3(B) of the Operating Agreement, which provides:

> The Managing Board shall act only by the affirmative vote of a majority of the Managing Board as if it were fully constituted and all Managing Board Members participated in such vote, for all actions of MIG subject to Managing Board approval. . . . Any action required or permitted to be taken at a meeting of the Managing Board may be taken without a meeting if a written consent setting forth the action so taken is signed (including signature by electronic mail or other electronic means) by a sufficient number of Managing Board Members to effect such action as if the Managing Board had met in person with all Managing Board Members in attendance. Such consent may be in one instrument or in several instruments, and shall have the same force and effect as an action taken at a meeting and may be described in any writing as having been taken at a meeting.[98]

The Operating Agreement is clear and unambiguous. MIG's officers could be removed only by a majority vote of the members of the Managing Board. That vote could be effectuated at either a meeting of the Managing Board or by written

---

[95] Operating Agreement § 7.2.

[96] *Id.* § 7.11(F).

[97] *Id.* § 7.6(B)(17).

[98] *Id.* § 7.3(B).

21

consent signed by a majority of the Managing Board members. Because Plaintiffs held two of the three Managing Board seats, neither of them could be removed as officers unless at least one of them voted in favor of removal.

McNeill's October 7, 2024, phone call to Ropko was not a meeting of the Managing Board, and McNeill does not suggest otherwise. McNeill's backdated November 26, 2024, Removal Consent fares no better. Neither Ropko nor Burdi signed it.[99] McNeill contends that he did not need Plaintiffs' signatures on the Removal Consent because he had the authority to execute it on their behalf under the Voting Agreement. This argument conflates the Voting Agreement with a proxy.

Under Delaware law, "[a] proxy instrument is evidence of an agency relationship wherein the . . . principal appoints a proxy holder-agent as attorney-in-fact with respect to the voting rights." *Daniel v. Hawkins*, 289 A.3d 631, 647–48 (Del. 2023). In other words, "[what] we call a proxy is nothing more than evidence of a relationship. . . . It simply testifies that A. has constituted B. his agent to act for him in a vicarious capacity." *Duffy v. Loft, Inc.*, 151 A. 223, 227 (Del. Ch.), *aff'd*, 152 A. 849 (Del. 1930). As this court observed more recently:

> A "proxy" . . . is merely written evidence of an agency relationship in which a principal (the [individual] entitled to vote) authorizes an agent (the person designated on the proxy []) to vote the principal's [votes] with respect to the matters and in the manner specified in the proxy.

---

[99] *See* JX 120 at 2.

*Parshalle v. Roy*, 567 A.2d 19, 27 (Del. Ch. 1989) (citing *Duffy*, 151 A. at 227).

Under the LLC Act, managers may vote by proxy unless otherwise restricted in the limited liability company agreement. Under Section 18-404(c), "[a] limited liability company agreement may set forth provisions relating to . . . voting in person or by proxy . . . " 6 *Del. C.* § 18-404(c). But "[u]nless otherwise provided in a limited liability company agreement, on any matter that is to be voted on by managers, the managers may vote in person or by proxy, and such proxy may be granted in writing, by means of electronic transmission or as otherwise permitted by applicable law." 6 *Del. C.* § 18-404(d).

The Operating Agreement does not prohibit the members of the Managing Board from voting by proxy.[100] But the Voting Agreement is not a proxy. It does not appoint McNeill as Plaintiffs' agent, authorize him to cast their votes, or empower him to take unilateral action on behalf of the Managing Board, such as execute a written consent on Plaintiffs' behalf. It does not use appointment language. Instead, it is written as a covenant by Plaintiffs to "vote in the same manner as" McNeill.[101]

---

[100] *See* Operating Agreement § 7.3(B).

[101] *See* Voting Agreement ("[Ropko and Burdi] will vote in the same manner as [McNeill].").

23

The Voting Agreement does not transfer Plaintiffs' voting authority to McNeill or create an agency relationship permitting McNeill to act on their behalf. As this court has recognized, a proxy grants the authority to cast another's votes, whereas a voting agreement reflects a contractual commitment governing how a party will exercise its voting rights. *See White Marble LLC v. Chen*, 2025 WL 4636558, at *24 (Del. Ch. Oct. 31, 2025). Thus, absent a clear agency appointment, the Voting Agreement does not authorize McNeill to exercise Plaintiffs' voting rights unilaterally. Under the Operating Agreement, "the affirmative vote of a majority of the Managing Board as if it were fully constituted and all Managing Board Members participated in such vote" was required for actions subject to Managing Board approval, including officer dismissal.[102]

Therefore, because the Voting Agreement is not a proxy, the Removal Consent did not validly remove Plaintiffs as officers of MIG.

### b. A vote of the Managing Board would not have been futile.

Defendant argues that, even if the Voting Agreement is not a proxy, any requirement to hold a meeting of the Managing Board should be excused. That argument fails. Defendant relies on the general notion that a contractual party need

---

[102] Operating Agreement § 7.3(B).

not perform a futile act.[103]  The limited case law addressing futility in contract-compliance settings arises in materially different contexts, most commonly where a party seeks to excuse compliance with contractual notice and cure provisions or contractual pre-suit dispute resolution procedures.  Even in those cases, Delaware courts apply the futility doctrine narrowly.

Delaware decisions addressing whether to excuse contractual pre-suit notice and cure provisions as futile are limited.  In *Cornell Glasgow, LLC v. LaGrange Properties, LLC*, 2012 WL 6840625, at *13 (Del. Super. Ct. Dec. 7, 2012), the Superior Court observed the scarcity of Delaware authority defining when futility excuses compliance with a notice and cure provision.  *Cornell* relied upon *In re Best Payphones, Inc.*, 432 B.R. 46 (S.D.N.Y. 2010), *aff'd*, 450 F. App'x 8 (2d Cir. 2011), which framed futility as a narrow exception tied to repudiation—*i.e.*, where the counterparty has "positive[ly] and unequivocal[ly]" disavowed performance such that compliance with a notice and cure provision would be futile.  *Id.* at 54, 59; *accord Halinski*, 2025 WL 2103798, at *6.  Other cases were fact and context-specific.  *See, e.g.*, *Rsrvs. Dev. LLC v. R.T Props., L.L.C.*, 2011 WL 4639817, at *7 (Del. Super. Ct. Sept. 22, 2011) (excusing notice based on the asserted inability of

---

[103] Def.'s Answering Br. 41 (citing *Halinski v. ADS Grp. Acq., LLC*, 2025 WL 2103798 (Del. Ch. July 28, 2025)).

25

such notice to facilitate compromise); *S'holder Representative Servs. LLC v. Renesas Elecs. Corp.*, 2024 WL 5192070, at \*22−23 (Del. Ch. Dec. 3, 2024) (declining to order a pre-suit meeting that had become futile once litigation was pending, and the relief sought was monetary); *Anvil Hldg. Corp. v. Iron Acq. Co.*, 2013 WL 2249655, at \*12 (Del. Ch. May 17, 2013) (concluding that it was reasonably conceivable at the pleadings stage that a contractually contemplated negotiation period might have been futile based on the seller's detailed response rejecting the buyer's claims); *In re Dissolution of Jeffco Mgmt., LLC*, 2021 WL 3611788 (Del. Ch. Aug. 16, 2021) (declining to require an appraisal in a limited liability company dissolution where the member's capital account was negative, rendering valuation futile), *aff'd*, 285 A.3d 125 (Del. 2022).

Defendant has not demonstrated that his noncompliance with the Operating Agreement should be excused as futile. The Operating Agreement expressly allocates the authority to remove officers to the Managing Board and specifies how the Managing Board must act. Unlike the cases upon which Defendant relies, this case does not involve a notice-and-cure provision or any scenario analogous to his cited authorities. Rather, this case involves whether the court should excuse Managing Board action as required under the Operating Agreement. When an alternative entity agreement prescribes how its governing body must act, the governing body may not ignore it. Nor will this court refuse to enforce it merely

26

because one party deems it to be inconvenient. Context matters. Our case law has consistently held that even when the outcome of a board vote is seemingly predictable, a meeting of the company's governing body should not be deemed futile. As this court has observed:

> Both formality and the group dynamics of board action are important in corporate law. Formality in such circumstances is not "mere formality", it is treated by courts as important because it tends to focus attention on the need for deliberation and the existence of accountability structures. With respect to group dynamics, it is an old rule that boards may act with legal effect only at duly convened meetings at which a quorum is present. Again functional reasons underlie the law's insistence on correct form.

*Cellular Info. Sys., Inc. v. Broz*, 663 A.2d 1180, 1186 (Del. Ch. 1995) (citing Robert C. Clark, *Corporate Law*, 110−12 (1986)), *rev'd on other grounds*, 673 A.2d 148 (Del. 1996).

McNeill's argument cannot square with Delaware's policy favoring maximum freedom of contract for alternative entities[104] and the value it places on "the collaboration that comes when the entire board deliberates on corporate action

---

[104] "It is the policy of [the LLC Act] to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." 6 *Del. C.* § 18-1101(b). *See also Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 295 (Del. 1999); *Holifield*, 304 A.3d at 922 (Del. 2023) ("The LLC A[ct] provides '[i]t is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements.' Thus, this Court has observed that the approach of the LLC A[ct] is 'to provide members with broad discretion in drafting the [limited liability company agreement] and to furnish default provisions when the members' agreement is silent.'" (citation modified)).

and when all directors are fairly accorded material information." *OptimisCorp v. Waite*, 137 A.3d 970 (Del. 2016) (TABLE); *accord GB-SP Hldgs., LLC v. Walker*, 2024 WL 4799490, at *23–24 (Del. Ch. Nov. 15, 2024); *Ghatty v. Mudili*, 2025 WL 2963154, at *5 (Del. Ch. Oct. 21, 2025); *see also Lippman v. Kehoe Stenograph Co.*, 95 A. 895, 899 (Del. Ch. 1915) ("Each member of a corporate body has the right to consultation with the others and has the right to be heard upon all questions considered, and it is presumed that if the absent members had been present they might have dissented and their arguments might have convinced the majority of the unwisdom of their proposed action, and thus have produced a different result."). To this end, "[w]e proceed on the premise that if proper procedures were followed, then even a director in the minority could, like the 12th juror, sway the rest of his board colleagues to what he believed was the right answer." *Perry v. Sheth*, C.A. No. 2020-0024-JTL, at 51:21–52:1 (Del. Ch. Jan. 16, 2020) (TRANSCRIPT).

A meeting of the Managing Board among McNeill, Ropko, and Burdi would have allowed McNeill to explain the reasons behind the proposed removal. More important, it would have allowed Ropko and Burdi to argue against their removal before any formal action was taken. *See Ghatty*, 2025 WL 2963154, at *6 (rejecting the argument that notice to directors targeted for removal at a special meeting was not required where they lacked the power to block the action) (citing *OptimisCorp*, 137 A.3d at 970)).

28

Section 7.3(B) of the Operating Agreement permits actions without a meeting only if a written consent is "signed . . . by a sufficient number of Managing Board Members to effect such action as if the Managing Board had met in person with all Managing Board [m]embers in attendance." A consent executed by McNeill alone, purporting to sign "on behalf of" the other two Managing Board members based on the Voting Agreement, does not satisfy the Operating Agreement's signature requirement.

Therefore, the Removal Consent did not, and could not, ratify the removal of Plaintiffs.

### 3. McNeill lacked unilateral authority to remove Plaintiffs.

As a fallback argument, McNeill insists that he had the right to remove Plaintiffs as officers irrespective of the Voting Agreement.[105] For this, he relies upon Section 7.3(A) of the Operating Agreement, which governs the term of Managing Board members' service. It states, in pertinent part:

> A Managing Board Member shall serve on the Managing Board at the pleasure of the party or parties, if applicable, that designated such Managing Board Member . . . . Only the party(s) entitled to designate such Managing Board Member shall be entitled to remove him or her, with or without Cause, by delivering written notice of such removal to MIG. . . .[106]

---

[105] Def.'s Answering Br. 38–39.

[106] Operating Agreement § 7.3(A).

29

McNeill argues that he designated Plaintiffs as members of the Managing Board and, thus, had the power to remove them.[107] This is entirely a litigation construct. There is no credible evidence that McNeill purported to remove Plaintiffs as officers on the grounds that he had authority to remove them because he had designated them as members of the Managing Board. But McNeill did not designate them as members of the Managing Board. Instead, he designated them as officers under the Original Operating Agreement, and the members effectively chose them as officers when they approved the Operating Agreement.

Section 7.2 of the Operating Agreement provides that, "[i]nitially," two Managing Board seats were to be filled by the individuals who held the offices of "the then CEO" and "the then COO." The Operating Agreement prescribes a distinct framework for (i) an initial three-member Managing Board with officer-linked seats and (ii) the later-added Managing Board members who a designating party might appoint as part of a structure contemplating institutional investors. Ropko and Burdi fall into the former category, as they became members of the Managing Board by virtue of being "then" CEO and COO, respectively.[108] Therefore, McNeill did not

---

[107] Def.'s Answering Br. 38.

[108] Defendant's argument that he had the unilateral right to remove Ropko and Burdi because he appointed them to their positions is a litigation construct that fails under the plain language of the Operating Agreement. If Defendant could have unilaterally removed

designate them as members of the Managing Board.  Hence, he lacked the unilateral authority to remove Plaintiffs as officers of the Company.

## B. Attorneys' Fees

"Delaware generally follows the American Rule, under which litigants are responsible for their own attorneys' fees, regardless of the outcome of the lawsuit." *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 280 (Del. 2022) (quoting *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417 (Del. 2010)).  There are exceptions to the American Rule.  One exception "is found in contract litigation that involves a fee shifting provision." *Id.* (quoting *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007)).  If a contract contains a fee-shifting provision, Delaware courts will enforce it. *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352 (Del. 2013).

---

Plaintiffs as officers and members of the Managing Board, there would have been no need for him to have executed a written consent on behalf of the entire Managing Board.  The Removal Consent expressly stated that the entire Managing Board was removing Plaintiffs as officers.  JX 120.  McNeill admitted as much both in his answer to the Amended Complaint and at trial.  *See* Answer (Dkt. 57 ¶ 36 ("McNeill admits that on October 7, 2024, he informed Ropko that he was terminated from his role as CEO and was removed as a member of the Managing Board, effective immediately, *pursuant to an Action by Written Consent of the Managing Board* of [MIG] . . . .") (emphasis added)); Tr. 349:15−21 (McNeill) ("Q.  And you would admit that the managing board needed to remove Mr. Burdi and Mr. Ropko from their positions as officers of the company; correct?  A.  That is correct.  Q.  And also from their positions as managing board members; right?  A.  That is correct.").

31

Section 11.10 of the Operating Agreement provides that,

> If any legal action or other proceeding is brought for the enforcement . . . of any of the rights or provisions of this Agreement, or because of an alleged . . . breach . . . in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and all other costs and expenses incurred in that action or proceeding, in addition to any other relief to which it may be entitled.[109]

McNeill does not contest the validity or effectiveness of the fee-shifting provision in Section 11.10 of the Operating Agreement. Therefore, having prevailed in proving a breach of the Operating Agreement, Plaintiffs are entitled to recover their reasonable attorneys' fees and expenses incurred in establishing that their purported removal violated the terms of the Operating Agreement.

## III.  CONCLUSION

For purposes of this dispute, the court assumes that the Voting Agreement is a valid and enforceable agreement between the parties. McNeill's attempt to remove Plaintiffs through the Removal Consent was ineffective and violated the terms of the Operating Agreement.  Plaintiffs are entitled to declaratory relief under 6 *Del. C.* §§ 18-110 and 18-111.  The court declares that Ropko is MIG's CEO, that Burdi is MIG's COO, and that, by virtue of holding those offices, Plaintiffs are members of the Managing Board.

---

[109] Operating Agreement § 11.10.

Plaintiffs are entitled to reasonable attorneys' fees and expenses incurred in establishing their right to office in this litigation. Plaintiffs shall file an affidavit in accordance with Court of Chancery Rule 88 within ten business days.